UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

ELIZABETH G. DUNCAN,                          CIVIL NO. 11-555 (MJD/JSM)

       Duncan,

v.                                                        REPORT AND RECOMMENDATION

MICHAEL J. ASTRUE
Commissioner of Social Security,

       Defendant.


     Defendant has denied plaintiff Elizabeth Duncan's application for disability insurance benefits ("DIB") under Title II of the Social Security Act ("the Act"), 42 U.S.C. §§401-433.  Duncan's application for supplemental security income ("SSI") pursuant to Title XVI of the Act, 42 U.S.C. §§1381-1383(c) was granted and Duncan was determined to be disabled as of August 1, 2003.  Duncan filed a complaint seeking further review of the denial of DIB benefits.  The matter is now before the Court on cross-motions for summary judgment (Docket Nos. 6, 13).  This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation by the District Court pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.1(c).

## I.    PROCEDURAL BACKGROUND

     This matter has a long procedural history, dating to May, 2003 when Duncan[1] protectively filed[2] for SSI and DIB benefits, alleging disability from April 1, 2001 (Tr. 97-

---

[1]    Duncan Elizabeth Duncan has also been known as Grace Duncan (Tr. 55); Betty Jean Stewart, Betty Jean Pryor, Betty Jean Marr (Tr. 97), and Betty Conley.  (Tr.134).

[2]    Duncan lived in Kansas until 2010, when she moved to Duluth, Minnesota.  As a result, the record in this case was developed by Duncan's attorneys in Kansas.  (Tr. 51, 356, 539, 545, 561).

99).  Duncan's date of last insured ("DLI") was December 31, 2002.  (Tr. 51, 153).  To qualify for DIB, Duncan was required to establish that she was disabled before the DLI. 20 C.F.R. §§ 404.315(a)(1), 404.320(b)(2).  The Social Security Administration ("SSA") denied Duncan's application on September 16, 2003. (Tr. 51-54).  The SSA denied Duncan's request for reconsideration on February 10, 2004, noting that "while the records show that you have been treated for conditions prior to 12/31/02, they do not provide sufficient evidence to show that you were disabled.  We have determined that your overall medical condition did not limit your ability to work through 12/31/02, the date you were last insured for disability benefits." (Tr. 58-61).  The medical evidence available at that time indicated that Duncan had a history of back and neck problems, infections, migraines, asthma, respiratory problems, a right wrist injury and depression. (Tr. 59).

Duncan requested a hearing before an Administrative Law Judge ("ALJ") on February 26, 2004, and a hearing was conducted by ALJ Ed Hoban on June 8, 2005. (T. 327-355).[3]  On July 29, 2005, ALJ Hoban rendered a decision that was partially favorable to Duncan.  (Tr. 33-43).  ALJ Hoban found that Duncan was disabled, as defined by the Act, from February 1, 2004 forward.  (Tr. 43)  However, as a result of the date ALJ Hoban established as the date of disability, Duncan was not entitled to DIB, as she failed to establish that she had a disabling impairment before the DLI. (Id.).

Duncan appealed the decision to the SSA Appeals Council ("Appeals Council") on August 9, 2005.  (Tr. 77).  Duncan's counsel indicated that "we agree with the finding of disability; we disagree that the disability began February 1, 2004 and not April 1,

---

[3]        Duncan was represented at this time by Sharon Meyers, Esq.

2001." (Tr. 77). On February 26, 2006, the Appeals Council vacated ALJ Hoban's decision in its entirety and remanded the matter for further proceedings (Tr. 79-83). The Appeals Council concluded that ALJ Hoban's decision reflected an inconsistent rationale for finding that the Duncan was not disabled before February 1, 2004 and disabled thereafter. (Tr. 80). The Appeals Council directed that on remand the ALJ was to: (1) give further consideration to treating and examining sources and explain the weight given to opinion evidence; (2) further evaluate Duncan's mental impairment; (3) obtain evidence from a medical expert to clarify the nature and severity of Duncan's impairments; (4) further consider Duncan's maximum residual functional capacity; and (5) obtain supplemental evidence from a vocational expert to clarify the effect of assessed limitations on Duncan's occupational base. (Tr. 81-82).

Administrative Law Judge George Bock conducted a hearing on July 27, 2006. (Tr. 356-395). Duncan was represented by attorney Cara Terrell at that hearing. (Tr. 358). ALJ Bock issued his decision on August 25, 2006 (Tr. 23-30), and found that Duncan had the following severe impairments: fibromyalgia syndrome, degenerative disc disease of the lumbar spine, degenerative disc disease and degenerative joint disease of the cervical spine, edema, asthma and depression. (Tr. 28). However, ALJ Bock found that Duncan's testimony and allegations regarding her condition before August 1, 2003 were not fully credible in that they were inconsistent with the medical evidence and findings regarding Duncan's functional limitations. (Tr. 29). ALJ Bock concluded that Duncan was able to perform her past relevant work as a medical transcriber from April 1, 2001 through July 31, 2003, but that she was disabled as of

August 1, 2003.  (Id.).  As a result, Duncan was not entitled to Title II (DIB) benefits because her DLI was before August 1, 2003. (Tr. 30).

Duncan sought a review of the ALJ's decision by the Appeals Council on September 29, 2006. (Tr. 18).  By January 16, 2008, the Appeals Council had not made a decision regarding Duncan's request, so Duncan's then-lawyer, Gregory Eufinger, Jr., wrote asking about the current status of the matter (Tr. 16).  The Appeals Council issued its decision on February 11, 2008, denying Duncan's request for further review. (Tr. 12-14).  The Appeals Council indicated that it had considered the "reasons you disagree with the decision and the additional evidence listed on the enclosed Order of Appeals Council."[4]

Following the Appeals Council's negative decision, Duncan appealed to the United States District Court for the District of Kansas (Tr. 425-427) (docket report for Duncan v. Astrue, Civ. No. 08-2144 (D. Kansas)).  On April 17, 2009 Magistrate Judge Donald W. Bostwick issued a Report and Recommendation ("R & R") recommending that ALJ Bock's August 25, 2006 decision be reversed and the matter remanded for further proceedings. (Tr. 432A-448).  Judge John W. Lungstrom adopted Magistrate Judge Bostwick's R & R in its entirety.  (Tr. 419-420).

Magistrate Judge Bostwick's recommendation was based in large part on his conclusion that ALJ Bock erred in giving "great weight" to the opinion of Dr. David Pulcher, a psychologist who examined Duncan one time at the request of the state agency and who provided a consultative evaluation regarding Duncan's mental condition.  (Tr. 446).  ALJ Bock erroneously referred to Pulcher as Duncan's "treating

---

[4]     The Appeals Council received and considered a letter dated November 10, 2006, from William V. Thompson, III, R.N., which it made part of the record.  (Tr. 15).

psychiatrist," when in fact he was a non-treating psychologist, whose opinion "may never be given controlling weight" and whose opinion was "not worthy of the deference afforded a treating source opinion." (Id.).  Magistrate Judge Bostwick considered and rejected Duncan's argument that ALJ Bock failed to properly develop the record by failing to obtain evidence from treating or examining physicians from the 2001 to 2003 timeframe.  (Tr. 439-440).  Magistrate Judge Bostwick found no error in ALJ Bock's development of the record.  (Id., p. 442).  Having determined that remand was necessary to properly weigh the medical opinions, the court did not reach the question of whether ALJ Bock properly determined the onset set of Duncan's disability.  (Tr. 448).

A hearing before ALJ Bock was scheduled for October 7, 2009.  (Tr. 539). Duncan and her counsel appeared at the hearing, but ALJ Bock immediately noted that the file was incomplete and that it would be necessary to delay the hearing until Duncan's counsel could update Duncan's medical records.  (Tr. 541).  ALJ Bock commented that "the last thing I have in the file is the materials that were in the file when I decided the case back in August of 2006, which is three years ago, so we need the last three years' worth of medical records from whoever's treating her."  (Tr. 541-542).  Additionally, ALJ Bock urged that "we need to get you to get these records, whatever's out there… ."  (Tr. 543).

ALJ Bock conducted another hearing on April 13, 2010.  (Tr. 545-579).  ALJ Bock was aware of the lack of medical evidence pre-dating Duncan's DLI, and asked her attorney, Gregory Eufinger, "[w]ell, what's your theory of your case?  How am I supposed to find this lady disabled before August of '03?" (the date ALJ Bock previously determined was the date on which Duncan was disabled).  (Tr. 549).  Duncan's attorney

pointed ALJ Bock to one record of two MRIs that Duncan underwent in 2001.  (Tr. 550).

ALJ Bock decided to have a neurologist review the 2001 and more recent records

regarding Duncan's cervical spine issues and then conduct a supplemental hearing

after that review.  (Tr. 555, 560).  ALJ Bock noted that in light of the lack of medical

evidence from the 2001 timeframe, having a neurologist review the medical records was

Duncan's "only hope" (to obtain DIB). (Tr. 555).  Aware of what a hindrance to Duncan's

case the lack of medical records presented, ALJ Bock commented:

> And I'm doing what I can for you, ma'am, but I can't work miracles
> and I have to follow the law.  But there's a shot here that if I get a
> neurologist to look at this record of this MRI back in 2001 and the
> history of that going forward, he might say she equaled a listing
> back then.  I don't know.  But there was sub-stenosis. So we'll
> adjourn and we'll have another supplemental hearing and see what
> the doctors say.
>
> ***
>
> I can't do anything more for you without more evidence…so I'm
> trying to get the evidence.
>
> ***
>
> Well, your Counsel can explain it all to you.  But getting those old
> records, if you can get them, and the chances of getting them are
> slim to none, that's not going to change things.  If there were
> records in 2001, 2002, mental health treatment.

(Tr. 556, 559).

ALJ Bock conducted the supplemental hearing conducted on June 15, 2010.  (Tr.

561-579).  Duncan was again represented by attorney Gregory Eufinger.  (Tr. 561).  Dr.

Hershel Goren, a neurologist, reviewed Duncan's medical records and testified that the

records supported a disability onset date of August 20, 2003.  (Tr. 564).  ALJ Bock

issued his decision on July 29, 2010, and again concluded that Duncan became

disabled as of August 1, 2003 and continued to be disabled.  (Tr. 403-415).  By this

time, Duncan had moved to Duluth, Minnesota. (Tr. 403).  Duncan was notified that she had thirty days to file written exceptions to ALJ Bock's decision.  (Id.).

On September 23, 2010 Duncan's current attorney, Sean Quinn, wrote to the Appeals Council on Duncan's behalf and asked that his letter be considered an appeal of that portion of the ALJ's decision that established a disability date of August 1, 2003. (Tr. 400).  Quinn stated that "we are appealing the onset date alleging that her onset date occurred on or before December 31, 2002, her date last insured."  (Id.).  Quinn further stated:

> "[a]s I have just been hired, I would appreciate the Appeals Council giving me time to gather medical evidence.  I understand that there was very sparse evidence of Ms. Duncan's disability on or before the August 2003 onset date found by the Judge.  We think that the medical evidence that predates August 1, 2003 will be sufficient to find an earlier onset date.  But it will take time for me to gather all of this evidence. (Ms. Duncan's previous representatives probably should have done a better job in gathering it).

(Tr. 400-401).

On January 11, 2011, the Social Security Appeals Council denied Duncan's Request for Review, making ALJ Bock's decision final.  (Tr. 396); 42 U.S.C. § 405(g); Browning v. Sullivan, 958 F.2d 817, 822 (8th Cir. 1992); 20 C.F.R. §§404.981, 416.1481.  The Appeals Council noted that Duncan had failed to file exceptions or to ask for an extension of time in which to do so within 30 days of the date she had received the ALJ's[5] decision.  (Tr. 396).

Duncan sought review of the ALJ's decision and the Appeals Council's decision by filing a Complaint with this Court pursuant to 42 U.S.C. §405. [Docket No. 1].  The

---

[5]     Except as noted, the Court's reference to the "ALJ" from this point forward through the end of the Report and Recommendation is to ALJ Bock and his second decision, issued on July 29, 2010.

Complaint alleged that the SSA's determination that Duncan was not disabled before her DLI was not supported by substantial evidence and "applied an erroneous standard of law."  Complaint, ¶5.[6]  Duncan alleged that she became totally disabled on or about April 1, 2001.  Id., ¶6.  Duncan further alleged that the Appeals Council erred by failing to allow her to present additional evidence.  Id., ¶11.

Duncan's motion for summary judgment narrowed the scope of Duncan's disagreement with the ALJ's decision:

> So it is not really determining whether there is substantial evidence in the record to support the ALJ's decision. There is.  Rather, the issue before the Court is whether there should have been more evidence submitted to the ALJ and whether there was error, committed by the Defendant (on the application, on reconsideration, by the two separate ALJs, during five separate hearing, and by the Appeals Council) in failing to obtain the older records.  Further, whether there was error, by the Appeals Council, in failing to keep the record open, once they were specifically informed that more records would be forthcoming, to allow submission of those older records.

Plaintiff's Memorandum of Law in Support of Motion for Summary Judgment ("Pl. Mem."), p. 15 [Docket No. 7].  Despite not challenging the sufficiency of the evidence on which the ALJ based his decision, Duncan sought from this Court an order granting her DIB, based on a period of disability predating her DLI.  In the alternative, Duncan sought an order remanding her case for further proceedings.  Id., p. 2.

In connection with her motion for summary judgment, Duncan submitted records of treatment from the Johnson County Mental Health Center, dated March and April, 2000.  Affidavit of Sean Quinn in Support of Motion for Summary Judgment ("Quinn Aff."), Ex. 1.  Duncan also submitted records of treatment from the University of Kansas

---

[6]    Duncan's Complaint purports to be both an appeal from the Social Security Appeals Council's decision and appeal of final decision regarding Duncan's eligibility for DIB.  Complaint, ¶¶3, 5.

Medical Center, dating from 1984 to 2004.  Quinn Aff., Ex. 2.  Quinn obtained the records after contacting the Appeals Council in September, 2010.  Quinn Aff., ¶¶9, 10. These records were not considered by the ALJ or the Appeals Council and are not part of the record.  Pl. Mem., pp. 16-17.

## II.   PROCESS FOR REVIEW

Congress has prescribed the standards by which Social Security disability benefits may be awarded.  "The Social Security program provides benefits to people who are aged, blind, or who suffer from a physical or mental disability."  Locher v. Sullivan, 968 F.2d 725, 727 (8th Cir. 1992); 42 U.S.C. § 1382(a).  The Social Security Administration shall find a person disabled if the claimant "is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment."  42 U.S.C. § 1382c(a)(3)(A).  The claimant's impairments must be "of such severity that (the claimant) is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."   42 U.S.C. § 1382c(a)(3)(B).   The impairment must last for a continuous period of at least twelve months or be expected to result in death.  42 U.S.C. § 1382c(a)(3)(A); see also 20 C.F.R. §§ 404.1509, 416.909.

### A.   Administrative Law Judge Hearing's Five-Step Analysis

If a claimant's initial application for benefits is denied, he or she may request reconsideration of the decision.  20 C.F.R. §§ 404.907-09, 416.1407-09.  A claimant who is dissatisfied with the reconsidered decision may obtain administrative review by an ALJ.  42 U.S.C. §§ 405(b)(1), 1383(c)(1); 20 C.F.R. §§ 404.929, 416.1429.  To determine the existence and extent of a claimant's disability, the ALJ must follow a five-

step sequential analysis, requiring the ALJ to make a series of factual findings regarding the claimant's work history, impairment, residual functional capacity, past work, age, education and work experience.  See 20 C.F.R. §§ 404.1520, 416.920; see also Locher, 968 F.2d at 727.  The Eighth Circuit described this five-step process as follows:

> The Commissioner of Social Security must evaluate: (1) whether the claimant is presently engaged in a substantial gainful activity; (2) whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations; (4) whether the claimant has the residual functional capacity to perform his or her past relevant work; and (5) if the claimant cannot perform the past work, the burden shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.

Dixon v. Barnhart, 353 F.3d 602, 605 (8th Cir. 2003).

## B.   Appeals Council Review

If the claimant is dissatisfied with the ALJ's decision, he or she may request review by the Appeals Council, though review is not automatic.  20 C.F.R. §§ 404.967-404.982, 416.1467-1482.  The decision of the Appeals Council (or of the ALJ, if the request for review is denied) is final and binding upon the claimant unless the matter is appealed to Federal District Court within sixty days after notice of the Appeals Council's action.  42 U.S.C. §§ 405(g), 1383(c)(3); 20 C.F.R. §§ 404.981, 416.1481.

## C.   Judicial Review

Judicial review of the administrative decision generally proceeds by considering the decision of the ALJ at each of the five steps.  The Court is required to review the administrative record as a whole and to consider:

1.    The credibility findings made by the ALJ.

2.    The plaintiff's vocational factors.

10

3. The medical evidence from treating and consulting physicians.

4. The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5. Any corroboration by third parties of Duncan's impairments.

6. The testimony of vocational experts, when required, which is based upon a proper hypothetical question which sets forth Duncan's impairment.

Cruse v. Bowen, 867 F.2d 1183, 1185 (8th Cir. 1989) (citing Brand v. Secretary of HEW, 623 F.2d 523, 527 (8th Cir. 1980)).

This Court's review is limited to determining whether the ALJ's decision is supported by substantial evidence in the record as a whole.   42 U.S.C. § 405(g); Bradley v. Astrue, 528 F.3d 1113, 1115 (8th Cir. 2008); Johnson v. Apfel, 210 F.3d 870, 874 (8th Cir. 2000); Clark v. Chater, 75 F.3d 414, 416 (8th Cir. 1996).  "We may reverse and remand findings of the Commissioner only when such findings are not supported by substantial evidence on the record as a whole."  Buckner v. Apfel, 213 F.3d 1006, 1012 (8th Cir. 2000) (citation omitted).  Additionally, Section 405(g), sentence six, permits the Court to remand a matter to the Commissioner (1) where the Commissioner, with good cause moves to remand the case before having filed an answer or (2) where new and material evidence is presented that for good cause was not made part of the record earlier.   Id. (citing 42 U.S.C. §405(g)).  "A remand pursuant to the second part of sentence six concerns only new and material evidence and "does not rule in any way as to the correctness of the administrative proceeding… ."   Id.  See also Shalala v. Schaefer, 509 U.S. 292, 297 n. 2 (1993) ("Sentence six remands may be ordered in only two situations: where the Secretary requests a remand before answering the

Complaint, or where new, material evidence is adduced that was for good cause not presented to the agency.")

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)); see also Culbertson v. Shalala, 30 F.3d 934, 939 (8th Cir. 1994). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Buckner, 213 F.3d at 1012 (quoting Prosch v. Apfel, 201 F.3d 1010, 1012 (8th Cir. 2000)); see also Slusser v. Astrue, 557 F.3d 923, 925 (8th Cir. 2009) (citing Gonzales v. Barnhart, 465 F.3d 890, 894 (8th Cir. 2006)) (same); Cox v. Apfel, 160 F.3d 1203, 1206-07 (8th Cir. 1998) (same).

In reviewing the record for substantial evidence, the Court may not substitute its own judgment or findings of fact for that of the ALJ. Hilkemeyer v. Barnhart, 380 F.3d 441, 445 (8th Cir. 2004); Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993). The possibility that the Court could draw two inconsistent conclusions from the same record does not prevent a particular finding from being supported by substantial evidence. Culbertson, 30 F.3d at 939. The Court should not reverse the Commissioner's finding merely because evidence may exist to support the opposite conclusion. Buckner, 213 F.3d at 1011; Mitchell v. Shalala, 25 F.3d 712, 714 (8th Cir. 1994); see also Woolf, 3 F.3d at 1213 (the ALJ's determination must be affirmed, even if substantial evidence would support the opposite finding). Instead, the Court must consider "the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Gavin v. Apfel, 811 F.2d 1195, 1199 (8th Cir. 1987); see also Heino v. Astrue, 578 F.3d

873, 878 (8th Cir. 2009) (quoting Jackson v. Bowen, 873 F.2d 1111, 1113 (8th Cir. 1989)) (same).

The claimant bears the burden of proving his or her entitlement to disability insurance benefits under the Social Security Act.   See 20 C.F.R. §§ 404.1512(a), 416.912(a); Thomas v. Sullivan, 928 F.2d 255, 260 (8th Cir. 1991).   Once the claimant has demonstrated he or she cannot perform prior work due to a disability, the burden of proof then shifts to the Commissioner to show that the claimant can engage in some other substantial, gainful activity.   See Goff v. Barnhart, 421 F.3d 785, 790 (8th Cir. 2005); Eichelberger v. Barnhart, 390 F.3d 584, 591 (8th Cir. 2004); Martonik v. Heckler, 773 F.2d 236, 239 (8th Cir. 1985).

## III.   DECISION UNDER REVIEW

### A.   The ALJ's Findings of Fact

The ALJ concluded that Duncan was disabled under section 1614 (a)(3)(A) of the Social Security Act beginning on August 1, 2003.   (Tr. 416).   However, the ALJ concluded that Duncan was not entitled to disability insurance benefits under sections 216(i) and 223(d) of the Social Security Act prior to August 1, 2003.   (Tr. 416).   In support, the ALJ made the following findings:

1.   The claimant met the insured status requirements of the Social Security Act through December 31, 2002.

2.   The claimant has not engaged in substantial gainful activity since the alleged onset date (April 1, 2001) (20 CFR 404.1571 et seq., and 416.971 et seq.).   The claimant worked after the alleged onset date, but this work did not rise to the level of substantial gainful activity.

3.   Since the alleged onset date, the claimant has had the following severe impairments: depression, fibromyalgia syndrome, degenerative disc disease of the lumbar spine, degenerative disc and joint disease of the cervical spine, edema and asthma. (20 CFR 404.1520(c) and 416.920(c)).

4.      Prior to August 1, 2003, the date the claimant became disabled, the claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416,920(d), 416.925 and 416.926).

5.      Before August 1, 2003, the claimant had the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except the claimant can lift and carry 20 pounds occasionally and 10 pounds frequently; she can stand and/or walk for 15 to 20 minutes at one time for 2 hours out of an 8 hour day, and sit for 6 hours total in an 8 hour workday; she must be able to alternate between seated and standing positions and she can only occasionally climb stairs, bend, stoop, kneel, crouch or crawl.  She cannot climb ladders, ropes, or scaffolds and cannot be exposed to extreme heat or cold or to concentrated airborne particulates.

6.      Before August 1, 2003, the claimant was capable of performing past relevant work as a medical transcriber.  This work did not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

7.      Beginning on August 1, 2003, the severity of the claimant's impairment has met the criteria of section 12.04 of 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 416.920(d) and 416.925).

8.      The claimant was not disabled prior to August 1, 2003 (20 CFR 404.1520(f) and 416.920(f) but became disabled on that date and has continued to be disabled through the date of this decision (20 CFR 404.1520(d) and 416.920(d)).

9.      The claimant was not under a disability within the meaning of the Social Security Act at any time through December 31, 2002, the date last insured (20 CFR 404.315(a) and 404.320(b)).

10.     The claimant's substance use disorder(s) is not a contributing factor to the determination of disability (20 CFR 404.1535 and 416.935).

(Tr. 410-415).

### B.      The ALJ's Application of the Five-Step Process

The ALJ made the following determinations under the five-step process.  At step one in the disability determination, the ALJ determined that Duncan had not engaged in

substantial gainful activity since the alleged onset date of April 1, 2001.  (Tr. 410).  The ALJ noted that Duncan worked after the alleged disability onset date but that this work activity did not rise to the level of substantial gainful activity.  (Tr. 410).

At the second step of the evaluation, the ALJ found that Duncan had the severe impairments of depression, fibromyalgia syndrome, degenerative disc disease of the lumbar spine, degenerative disc and joint disease of the cervical spine, edema and asthma.  (Id.).

At the third step of the analysis, the ALJ reinstated his finding of August 25, 2006, which Duncan did not claim was erroneous.  (Tr. 411).  The ALJ determined that the record did not demonstrate, and no examining or reviewing physician or psychologist of record had opined that Duncan had any impairments that met or equaled the criteria contained in the Listing of Impairments before August 1, 2003.  (Id.).  Medical evidence the ALJ received after issuing his August 25, 2006 decision did not change this finding.   (Id.).   Additionally, the ALJ determined that Duncan had the following degree of limitation set out in 20 CFR, Part 404, Subpart P, Appendix 1: mild restriction in activities of daily living, mild difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace, and no episodes of decompensation, each of extended duration.  (Id.).  The ALJ concluded that Duncan's mental impairment did not satisfy the paragraph "C" criteria of listing section 12.04.  No treating, reviewing, or examining medical source had testified or opined that Duncan's mental symptoms were so severe as to satisfy the "C" criteria.  (Tr. 411).

Before reaching the fourth step of the evaluation process, the ALJ considered Duncan's residual functional capacity ("RFC").  (Tr. 411-415).  In making his findings

regarding Duncan's RFC, the ALJ considered "all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and 416.929 and [Social Security Regulations] 96-4p and 96-7p." (Tr. 411). The ALJ noted that the only deficiency identified in Magistrate Judge Bostwick's R & R related to the weighing of opinion testimony. (Id.). Therefore, the ALJ focused his discussion of Duncan's RFC in his July 29, 2010 decision on this issue and reinstated and incorporated by reference his remaining findings, including his findings regarding Duncan's credibility, from his August 25, 2006 decision.[7]

The ALJ had earlier concluded that before 2003, Duncan had only seen her treating physician for asthma and some pitting edema. (Tr. 26) (August 25, 2006 hearing decision). While Duncan had been diagnosed with fibromyalgia in 2004, the ALJ characterized that diagnosis as "very weak" because the examination showed no evaluation of trigger points needed to make this diagnosis. (Id.). The ALJ noted that Duncan had little treatment for her back and neck pain and that the MRIs showed only mild spinal stenosis of the cervical spine, with no stenosis or impingement in the lumbar spine. (Id.). Duncan had received no extensive pain treatment after the MRIs were taken, including no physical therapy, no surgery, and no steroid injections. (Id.). Additionally, the ALJ found that Duncan's daily living activities were "not that restrictive in 2001 and 2002." (Tr. 26). Duncan had worked as a nanny for most of 2001 in a situation she described as "very demanding" and had worked at an art gallery in 2002. (Id.). According to the ALJ, these activities "lessen[ed] [Duncan's] credibility regarding

---

[7]     This decision was incorrectly referenced by the ALJ as his "August 26, 2008 hearing decision." (Tr. 412).

disability during this time and indicate[d] that she was more capable than alleged." (Id.). The record also indicated that Duncan could do laundry, shop, wash dishes and drive to Kansas City herself. (Tr. 27).

The ALJ also found that there was no evidence of serious mental illness or psychosis before August, 2003. (Id.). Rather, the record indicated that Duncan's depression became very severe in 2003 and that she experienced intermittent psychosis in 2003. (Id.). Duncan testified that she had taken the antidepressant medication Zoloft for ten years, which helped her depression. (Id.). The ALJ concluded that based on these factors, and giving Duncan the benefit of the doubt, her conditions did not become disabling until August, 2003. (Tr. 27). Based on the overall record, the ALJ found Duncan's testimony to be only partially credible. (Id.).

Having incorporated these findings into his July 29, 2010 decision, the ALJ then weighed the medical evidence as directed by the district court. (Tr. 411-14); (Tr. 445-447) (Magistrate Judge Bostwick's R & R regarding weighing of the medical evidence); (Tr. 419) (adoption of Magistrate Judge Bostwick's Report and Recommendation by the district court). The ALJ gave the greatest weight to Dr. Hershel Goren, a physician who specializes in neurology and who is certified by the American Board of Psychiatry and Neurology. (Tr. 413). Dr. Goran testified at the June 15, 2010 hearing. (Tr. 413). The ALJ noted that Dr. Goren was the only medical source who had access to the entire medical record. (Id.). Dr. Goran opined that as of August 20, 2003, Duncan's depression was severe enough to meet the criteria of Listing 12.04, but not before that time. (Id.).

The ALJ also gave great weight to the opinion of examining psychologist David Pulcher, Ph.D.[8]  When Pulcher examined Duncan in August, 2003, Duncan reported that she slept a lot, had a loss of interest, low energy, loss of libido and feelings of discouragement and hopelessness.  She rated her mood as a 3-4 on a scale of 1-10, with "10" indicating a very good mood. (Tr. 413) (citing to Tr. 228-229) (Consultative Examination/Mental Health Status dated 8/20/03 by David Pulcher, Ph.D.).  Duncan alleged that she saw dead family members.  (Id.) (citing to Tr. 228).  Nonetheless, Dr. Pulcher found that Duncan's memory and cognition were generally good and that Duncan was involved in social interactions and the hobbies of making stained glass and reading, which Dr. Pulcher opined required at least some degree of focus and attention. (Id.) (citing Tr. 227-228).  Dr. Pulcher concluded that Duncan suffered from a major depressive disorder but was able to understand and carry out instructions, had adequate attention and concentration, and had no problems in working with others. (Id.) (citing Tr. 229).  The ALJ found that these conclusions were consistent with the medical evidence and well-supported by clinical findings and diagnostic evidence.  (Id.).  The ALJ pointed to the fact that Duncan told Dr. Pulcher that the antidepressant medication Zoloft controlled her symptoms, she had never been hospitalized for depression, and she had not seen a psychiatrist in the two years before her examination by Dr. Pulcher. (Tr. 413) (citing Tr. 227, 223) (evaluation by V. Ted Motoc, M.D. dated August 16, 2003).

The ALJ gave little weight to the opinion of J.E. Block, M.D.  (Id.).  Dr. Block was a family friend of Duncan's who did not examine her until January, 2004, three years

---

[8]   This is the health care professional the ALJ incorrectly identified as Duncan's treating psychiatrist in his August 25, 2006 decision.  (Tr. 25).

after Duncan claims to have become disabled.  (Id.).  Dr. Block opined that Duncan's ailments had been "progressing over at least the last two decades" and had "accelerat[ed] rapidly since 2000." (Id. (citing Tr. 310 (letter from Dr. Block to Duncan's lawyer Sharon Meyers dated July 7, 2006)).  Dr. Block indicated that Duncan's symptoms and limitations had been present since 2001.  (Tr. 413) (citing Tr. 288 (Physical Residual Functional Capacity Questionnaire completed by Dr. Block on February 8, 2004)).  Dr. Block purported to know this based talking with Duncan "over the years when we had family get togethers and on the phone."  (Id. citing Tr. 310)).

The ALJ would not give Dr. Block's opinion controlling weight because his opinions failed to establish that Duncan was disabled as of any particular date and he did not have a treating relationship with Duncan until 2004.  (Id.).  Further, there were no contemporaneous treatment notes to support Dr. Block's opinions before the date he examined Duncan.  (Id.).  "More significantly," the ALJ noted that Dr. Block's opinion that Duncan was disabled as of 2001 was not supported by any objective medical evidence, and was based "almost entirely" on anecdotal evidence, Duncan's subjective allegations and informal conversations "over the years."  (Tr. 414).  There was no indication that Dr. Block reviewed medical records that predated his evaluation of Duncan.  (Id.).  Finally, the ALJ noted that Dr. Block was an internist who did not specialize in orthopedic medicine, respiratory illness or psychology.  (Id.).  Dr. Block did not have any specialized knowledge of the SSA's evidentiary requirements.  (Id.)

The ALJ gave significant weight to the opinion of Carol Adams, Ph.D, who had reviewed Duncan's records for the agency.  (Tr. 414).  The ALJ found that Dr. Adams' opinions were consistent with the medical record, well-supported by treatment notes

and by diagnostic and clinical evidence. (Id.) (citing Tr. 244- 273) (SSA psychiatric reviews by Dr. Adams, completed on September 15, 2003).  Dr. Adams had concluded that Duncan had mild restrictions of activities of daily living, mild difficulties in maintaining social functioning and moderate difficulties in maintaining concentration, persistence, or pace.  (Tr. 254).  The ALJ found that Dr. Adams' opinion was consistent with the opinion of Marilyn Benton, Ph.D., a treating psychologist, who stated in 2003 that Duncan only recently had "slight depression."   (Tr. 414) (citing Tr. 277, 529). However, the ALJ gave little weight to Dr. Benton's opinion regarding Duncan's physical impairments.  (Id.)  Dr. Benton had stated that she was "not qualified to speak on behalf of [Duncan's] physical problems… ."  (Id.) (citing Tr. 529).  Further, the ALJ found that Dr. Benton's 2006 letter (Tr. 529-530) "sheds no new light on the relevant issue here— the onset date of [Duncan's] disability."  (Tr. 414).  The letter did not address limitations or restrictions resulting from Duncan's mental health symptoms.  (Id.).  Finally, the ALJ noted that Dr. Benton's opinions were not supported by mental health treatment notes, or by clinical or diagnostic evidence predating August 1, 2003.  (Id.).

The ALJ gave little weight to the opinion of Nancy Winfrey, Ph.D., who testified at the April 13, 2010 hearing.  (Tr. 415).  The ALJ rejected Dr. Winfrey's testimony that Duncan's mental impairments did not meet or equal the criteria of any listing sections because her opinion was not supported by the totality of the medical evidence.  (Id.). The ALJ noted that "[Duncan] is more limited by her mental impairments than Dr. Winfrey's opinion suggests."  (Id.).

At step four of the evaluation, the ALJ concluded that before August 1, 2003, Duncan was capable of performing past relevant work as a medical transcriber because

the work did not require the performance of work-related activities precluded by Duncan's RFC. (Id.). The ALJ relied on, and incorporated by reference, the Step 4 findings he made in his August 26, 2006 hearing decision, which Duncan did not challenge. (Tr. 415). In that decision, the ALJ concluded that from April 1, 2001 through July 31, 2003, Duncan had the RFC to perform sedentary work, including the ability to lift and carry 20 pounds occasionally and 10 pounds frequently, stand and/or walk for 15 to 20 minutes at a time and sit for 6 hours in an 8 hour day. Duncan would require a sit/stand option in her work. She could occasionally climb stairs, bend, stoop, kneel, crouch and crawl. She could not climb ladders, ropes or scaffolds, be around extreme heat or cold or be exposed to concentrated airborne irritants. Duncan had no manipulative limitations. (Tr. 27) (August 26, 2006 hearing decision, step four findings).

The vocational expert who testified at the 2006 hearing stated that Duncan had past relevant work as a medical transcriber and nanny. (Id.). Her work as a nanny could be performed in the national economy at the medium exertional level and Duncan's past work as a transcriber is generally performed in the national economy at the sedentary exertional level. (Id.). Based Duncan's RFC from April 1, 2001 through July 31, 2003, the vocational expert testified that a hypothetical individual like Duncan could perform her past relevant work as a medical transcriber. (Id.). However, a hypothetical individual like Duncan could not perform past relevant work on and after August 1, 2003. (Tr. 27). At the fifth step, the ALJ concluded that beginning on August 1, 2003, Duncan was disabled under section 1614(a)(3)(A) of the SSA. (Tr. 416).

## IV.    THE RECORD

### A.    Duncan's Testimony[9]

Duncan was born on June 8, 1957.  (Tr. 331).  Duncan had two years of college education, but left college before finishing her degree.  (Tr. 331).  Duncan was a self-taught medical transcriptionist, working in that profession since 1986.  (Tr. 150, 332).  In 1989, when Duncan was working as a medical transcriptionist at Kansas University, she broke her right wrist (Duncan is right-handed), but never had it properly treated because her employer told her that if she took time off work she would be replaced.  (Tr. 332, 372).  Duncan testified that she had herniated discs in her lumbar spine, which made it difficult for her to sit for prolonged periods of time.  (Tr. 333).  She experienced migraine headaches from the time she was sixteen, then began having "really bad" headaches where she would lose vision in one eye or the other and would experience double vision.  (Tr. 333).  Duncan also reported problems with chronic fatigue.  (Tr. 333).  According to Duncan, her health issues "came on gradually" over the course of a year or two, and there was nothing in particular that happened on April 1, 2001, the date she reported as the onset of her disability.  That date was chosen only because she had to pick a date for onset.  (Tr. 332).  In response to questioning by ALJ Hoban regarding the onset date, Duncan testified that she started having difficulty with chronic fatigue in 2000, at which time she would be so sick at night that she could not get any sleep and "just felt sick all the time."  (Tr. 334).

---

[9]    Transcript pages 327-345 contain Duncan's testimony before ALJ Hoban on June 8, 2005.  Transcript pages 356-395 contain Duncan's testimony before ALJ Bock on July 27, 2006.  Transcript pages 539-544 contain Duncan's testimony before ALJ Bock on October 7, 2009. Transcript pages 545-560 contain Duncan's testimony before ALJ Bock on April 13, 2010.  Transcript pages 561-579 contain Duncan's testimony before ALJ Bock on June 15, 2010.

In approximately 1995-1997, Duncan had her own medical transcription business, which she ran from her home.  (Tr. 335-336).  During this period Duncan testified that she was tired and not able to keep up with the business, in part because of her prior wrist injury and in part because of her asthma and vision problems.  (Tr. 335).  As to her fibromyalgia, Duncan testified that she had joint, muscle and ligament pain.  (Tr. 338).  Duncan took steroids for her fibromyalgia, but the steroids caused thrush,[10] which made her extremely tired.  (Tr. 339).  Duncan took antibiotics to treat the thrush.  (Id.).  Duncan also testified that she had taken Zoloft for six or eight years and that had she not taken Zoloft, she "would have killed someone or myself…there's a huge differen[ce]."  (Id.).

Duncan explained her relationship with Dr. Block, who was her daughter's stepmother's father.  (Tr. 340).  Duncan and Dr. Block attended family gatherings together and she saw him as a patient, although she tried to keep the appointments "few and far between" as it was far for her to travel to his practice.  (Id.)  Duncan testified that Dr. Block "took a very different approach to medicine.  [H]e's very holistic and so he was very informative and we would talk a lot about a lot of different things to do with my physical problems and he's always treated me like family and even now, when I go see him, he won't let me pay him because I'm family, even though I'm not."  (Tr. 381).

Duncan admitted that there was not very much lab work performed in connection with her treatment by Dr. Block—a result of the fact that she did not pay him and she

---

[10]     "Thrush" is an "infection of the oral tissues with Candida albicans; often an opportunistic infection in humans with AIDS or humans suffering from other conditions that depress the immune system."  Stedman's Medical Dictionary, p. 1832 (27th ed. 2000).

had been without health insurance for approximately ten years.  (Tr. 381).  Duncan also saw Dr. Stevens, who she described as a "really old man" who treated her for minor issues; for the bigger issues, she saw Dr. Block  (Tr. 340).

At the time of the first administrative hearing in 2005, Duncan was living with her husband on a horse farm, where, until "about 2001" she trained and groomed the horses and cleaned stables.  (Tr. 341-42).  In approximately 2003 or 2004, Duncan worked for a friend at an art gallery.  (Tr. 342).  Duncan opened the gallery and vacuumed and spent the night there because her allergies had gotten so bad that she could not live at the horse farm anymore.  (Id.).  The gallery was not very busy, and on a "heavy" day would be visited by two people.  (Tr. 371).  Duncan worked at the gallery for about a year, and apart from being provided a place to stay overnight, was not paid for her work.  (Id.).

Duncan was a live-in nanny for a physician's three children (ages 7, 8 and 9) from approximately March until November 2001.  (Tr. 343, 369).  In that position Duncan cooked, cleaned and drove the children around "practically all day."  (Tr. 345). She helped the children with their homework, got them ready for bed and put them to bed.  In the morning, she got them ready for school.  (Id.).  Duncan "did everything that had to do with the girls."  (Id.).  In exchange for her work, Duncan received room and board, the physician paid Duncan's car payment and periodically gave her spending money.  (Tr. 370).  Duncan quit because the work was too physically demanding.  (Id.). During this period Duncan began experiencing vision problems that made it problematic for her to be driving the children as much as she was required and it was difficult for her to sit in the car.  (Tr. 376).  Even if she had not been required to drive as much as she

was, Duncan believed that she would not have been able to continue caring for the children.  (Id.).  The children were very active, even "out of control" and "very violent." (Id.).  The work was very physical and Duncan had to nap during the day when the children were at school.  (Tr. 377).

Marilyn Benton, Ph.D. was Duncan's therapist and eventually became her personal friend.  (Tr. 343).  Duncan testified that she did not see Dr. Benton very often and that "usually, it's just on a friendship level."  (Tr. 344)  At the second administrative hearing before ALJ Bock on July 27, 2006, Duncan testified that she was not really seeing anyone for her depression.  (Tr. 373).  "I mean, I've got Marilyn [Benton] who I talk to, though not very often.  It's been a while since I've talked to her but, you know, I talk to…Dr. Block… I take Zoloft twice a day.  I've done that for about ten years and it has helped so much, even though it doesn't look like it today.  It really has saved my life and as long as I stay on that, I'm pretty good." (Id.).

At the July 27, 2006 hearing, Duncan testified that she got up in the morning between 5:00 a.m. and 9:00 a.m., had coffee, read the paper, and then went back to bed until about noon.  At noon, she would get up again, do a few chores, do some genealogy research and do a few more chores. (Tr. 373).  Duncan's husband did all of the cooking.  (Tr. 374).  On a good day Duncan was able to do some indoor gardening and walk outside if it was cool.  (Tr. 377).  On a bad day, she could not get out of bed. (Id.).  In a month, Duncan would have two good days, three to five really bad days, and the rest fell in between.  (Tr. 378).  Duncan's husband testified that in the timeframe of 2001 to 2002 he observed a diminution in Duncan's physical activity of thirty to forty percent.  (Tr. 382).  Further, Duncan had changed from being the "doer" in the

relationship to someone who could not remember things and who depended on him for the cooking, cleaning and grocery shopping.  (Tr. 384-388)

At the April 13, 2010 hearing, Duncan, her lawyer and the ALJ were all aware of the lack of medical records that would support a finding of disability before August 1, 2003.  (Tr. 549-550).  Duncan's lawyer asserted that his case for an earlier onset date would be based on Duncan's testimony.  (Tr. 549).  Duncan did not provide any substantive testimony at this hearing, but at the subsequent hearing, on June 15, 2010, Duncan testified that she alleged a disability onset date of April 1, 2001 because that was when she could no longer work.  (Tr. 567).  Duncan admitted that she worked as a nanny after that time but did not attempt to work after she quit her nanny position.  (Tr. 568).  Duncan testified that she did not know if she received any treatment from Dr. Benton in the 2001 time frame or not, but agreed that there were no records of such treatment. (Tr. 570).  Duncan further testified that in 2001 and 2002 she had migraine headaches two or three times a week.  (Tr. 570-571).  During these headaches she would have to go into a dark room and lie down.  (Id., 571).  Duncan also experienced breathing problems associated with her asthma and emphysema in 2001 and 2002, and had gotten an inhaler for her asthma before she quit working.  (Tr. 571).  Duncan testified that the headaches and breathing problems contributed to her need to stop working.  (Tr. 571-572).  Additionally, Duncan testified that she had pain, coughing and sneezing since before 2001, and had been taking Zoloft, Advair (for emphysema) and Albuterol (for asthma) since "probably 2000."  (Tr. 576).  Duncan's husband was prepared to testify at this hearing, but Duncan's lawyer conceded that his testimony

would merely repeat what he had already said, and agreed with the ALJ that there was no reason for him to testify.  (Tr. 578).

      **B.**      <u>**Medical Expert Testimony**</u>

No medical experts testified at the first administrative hearing in June, 2005.  (Tr. 327-355.   At the second hearing, Dr. Richard Watts, a physician board certified in internal medicine and cardiology, testified.  (Tr. 368).  Dr. Watts reviewed the medical records and testified that in his opinion Duncan did not meet or equal any of the SSA's listings of impairments.   (Tr. 362).   Dr. Watts noted that Dr. Block's diagnosis of fibromyalgia and chronic fatigue syndrome were the first diagnoses of either impairment, but that he disagreed with Dr. Block's diagnoses.  (<u>Id.</u>).  Dr. Watts found Dr. Block's diagnosis of fibromyalgia to be excessively subjective and Dr. Block failed to test the eighteen trigger points that are tested in connection with fibromyalgia.  (<u>Id.</u>).  Dr. Watts testified that Duncan's depression had existed over a long period of time and that Duncan reported that she had been hospitalized in 1988 for depression.  However, Dr. Watts concluded that he had no data to suggest that Duncan could not do simple repetitive tasks.  (Tr. 365).

At the April 13, 2010 hearing, Dr. Nancy Winfrey testified that in her opinion, Duncan did not meet the SSA's listing of impairments pertaining to mental illness.  (Tr. 551).   Dr. Winfrey noted Duncan's history of depression but also noted that Duncan's concentration, persistence and pace were moderate.  (Tr. 552).  Dr. Winfrey reviewed the results of Dr. Pulcher's 2003 consultative exam, in which he noted that Duncan had

a GAF score of 45[11] with a diagnosis of Major Depressive Disorder with mood congruent psychotic features.  (Tr. 553, citing Dr. Pulcher's report, Tr. 229).  Dr. Winfrey disagreed with Dr. Pulcher's GAF score and testified that "there's really no psychosis, there never has been…I think he was really reaching when it called it psychotic that she said she saw her dead family members.  It's not necessarily psychosis and there's no evidence of it in any of the rest of her files." (Tr. 554).  Dr. Winfrey expressed no opinion on Duncan's physical condition.  (Tr. 555).

Dr. Hershel Goren, a neurologist, testified at the supplemental June 15, 2010 hearing.  (Tr. 563-567).  Dr. Goren reviewed the medical records and concurred with Dr. Pulcher's August 20, 2003 consultative report in which Dr. Pulcher[12] assigned Duncan a GAF of 45.   Dr. Goren testified that Duncan's disability onset date was August 20, 2003 (Tr. 565).  Dr. Goren testified that he reviewed a report from neurologist Paul O'Boynick dated July 31, 2000, which referenced Duncan's depression. (Tr. 565-566, citing Tr. 217).  Dr. Goren noted that Dr. O'Boynick was a neurosurgeon and that he was unable to quantify the severity of Duncan's depression from Dr. O'Boynick's note.   (Id.). Similarly, Dr. Goren reviewed Dr. Phillip Stevens' records dating from April 12, 2000 to December 12, 2003 (Tr. 205-216) and testified that the records did not "allow me to say anything about the severity of depression.  So they are valid qualitatively but of no help

---

[11]     "[T]he Global Assessment of Functioning Scale [GAF] is used to report 'the clinician's judgment of the individual's overall level of functioning.'"  Hudson ex.rel. Jones v. Barnhart, 345 F.3d 661, 662 n. 2 (8th Cir. 2003) (quoting Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. Text Revision 2000) ("DSM-IV-TR")). A GAF score of 41-50 indicates serious symptoms and any serious impairment in social, occupational, or school functioning.  DSM-IV-TR 32.

[12]     Misidentified in the transcript as "Dr. Tolkar."

quantitatively.  So I'm not able to say whether the claimiant met any of the severity requirements for 12.04, or any listing that far back."  (Tr. 566).

### C.    Medical Evidence Before August, 2003 and Considered by the ALJ

Beginning in 1999, Duncan sought treatment from Dr. Philip Stevens. (Tr. 206-216).  A progress note dated October 18, 1999, noted that Duncan was taking 100 mg. of Zoloft and had been taking Zoloft for two years "with excellent results."  (Tr. 212).  Dr. Stevens' notes indicate that Duncan had neck and back problems and vision problems (Tr. 206) (entry dated April 12, 2000), problems with her wrist (id.) (entry dated 12/18/00), and memory lapses and headaches.  (id.) (entry dated April 28, 2000).  In his April 28, 2000 entry, Dr. Stevens noted that "Zoloft seems to counteract any serious depression."  (Id.).  On May 11, 2000, Dr. Stevens noted that Duncan "is not mentally depressed" and that her "will to be independent [is] very strong."  (Tr. 206).  On July 27, 2000, Dr. Stevens again noted that Duncan was taking Zoloft and there were no signs of depression. (Tr. 207).  On November 17, 2000, Dr. Stevens noted that Duncan had been diagnosed with asthma and emphysema and had a "rescue inhaler" of Albuteral. (Tr. 207).  Further, Duncan was continuing her work as a medical transcriptionist and taking Zoloft "to handle any depression."  Id. (quotations in original).  In July, 2001, after Duncan had been working as a nanny for approximately four months, Dr. Stevens noted that Duncan had "aches and pains in joints & has severe headaches/allergies (dogs, cats and birds esp.)—continued problems with lungs."  (Tr. 208).

On July 31, 2001, Dr. Stevens commented that Duncan enjoyed the family for whom she was acting as their nanny and her living situation, but that Duncan had continued lung problems.  (Id.). By October 2, 2001, Dr. Stevens noted that Duncan was

having some problems keeping up with her three young charges and was "always tired," but that she was "mentally positive and ok." (Id.). Fifteen days later, Dr. Stevens noted that Duncan had constant pain in her neck and back and that she was tired physically from caring for the girls and the big house where she was a nanny. (Tr. 208). Dr. Stevens' November 20, 2001 chart entry indicated that Duncan was "really tired, exhausted" had aches and pains and required complete rest. (Tr. 209). On June 1, 2002, Duncan was treated for allergies. (Tr. 213).

On June 27, 2002, Dr. Stevens noted that Duncan and her former husband (with whom she was then living) had acquired some horses she was caring for and that there were periods where Duncan was "really sick" and had pains in her back and arms. (Id.). On November 4, 2002, Dr. Stevens noted a "remarkable improvement" in Duncan's breathing. (Tr. 214). On March 5, 2003, Dr. Stevens noted that Duncan could not be outside, she was sick and tired and felt that "everything was getting worse." (Tr. 210). He also noted that Duncan was helping a friend with a small gallery. (Id.). On April 17, 2003, Dr. Stevens noted that Duncan's allergies were "very bad" and that there was no improvement in "any area"—Duncan was always tired and got sick easily. (Tr. 210). However, Duncan was "still volunteer[ing] and working in art." (Id.) (a reference to Duncan's work at her friend's art gallery). On April 29, 2003, Dr. Stevens wrote that Duncan was "concern[ed] about getting medical help—feels something is very wrong— a type of thrush, lumps under skin-rashes-pain in wrists/back-neck-joints etc. Always tired, yet wants to do things at farm [ ] help w[ith] art gallery—still can't be outside or gets sick." (Tr. 210).

Duncan was seen by Dr. O'Boynick for an evaluation in July, 2001.  (Tr. 217).

Dr. O'Boynick's evaluation noted that Duncan:

> Complains of numerous pains including long history of low back pain and recent exacerbation of neck pain with radiation down into the right arm.  She also complains of diffuse numbness and tingling in the entire right hand.
>
> ***
>
> She has had episodes of facial numbness on the right in the last weeks and she has diffused sensation subjectively on the right side.  Her past history is positive for depression.  She had had migraine and admits to past cocaine, crack, amphetamine and LSD use.
>
> ***
>
> It appears this lady has severe depression based on her current social situation and I do not see any harden [sic] fast evidence of radiculopathy.

(Id.).

In November, 2002, Duncan underwent an MRI of the cervical and lumbar spine. (Tr. 221).  The cervical spine MRI showed degenerative changes with prominent spurring on the right at C4-5 and C5-6 levels, and to a lesser degree on the left at C4-5 and C6-7 levels.  (Id.).  The lumbar spine MRI showed mild central and rightward disc extrusion at the L4-5 level and mild protrusion on the left at the same level, without significant displacement of nerve roots.  (Id.).

These are the only medical records contained in the administrative record that pre-date August, 2003 and that were considered by the ALJ.

### D. Medical Evidence After August, 2003

#### 1. Consultative Exams and Evaluations in Connection with Duncan's Application for SSI and DIB

Duncan underwent five consultative evaluations in connection with her application for SSI and DIB.  The first was an evaluation conducted by V. Ted Motoc,

M.D., a board certified internist, on August 16, 2003.  (Tr. 223-226).  Dr. Motoc recorded Duncan's chief complaints as "right wrist injury, neck, back, asthma, emphysema, allergies, possible autoimmune disorder, osteoporosis, migraines, depression, rashes and vision."  (Tr. 223).  Duncan reported to Dr. Motoc a thirty-year history of low back pain, a four-year history of shortness of breath and a thirt-year history of migraines. (Id.).  Duncan also reported a history of depression, with "no history of hospitalization for this condition." (Id.).  She told Dr. Motoc that she had not seen a psychiatrist for two years.  (Id.).  Dr. Motoc's musculoskeletal examination showed a full range of motion except in the dorsolumbar spine and cervical spine. (Tr. 225).  Dr. Motoc noted that there was no evidence of delusion, hallucination or evidence of paranoia on the day of the exam.  (Tr. 226).

Dr. Pulcher conducted a consultative exam on August 20, 2003. (Tr. 227-231). In response to Dr. Pulcher's question whether she feels depressed, Duncan answered "Yes, I think that is appropriate."  (Tr. 227).  Duncan told Dr. Pulcher that she takes Zoloft and has for many years, commenting that it keeps her from being suicidal. Duncan was not then in mental health counseling and had not been so recently.  (Id.).

At the time of Dr. Pulcher's examination, Duncan was working in her friend's art gallery. (Id.).  She reported that on a typical day, she got up between 9:00 a.m. and 10:00 a.m., showered and picked up and cleaned the gallery and did paperwork for the gallery owner.  (Id.).  Duncan reported that she was capable of doing laundry and shopping, kept track of finances and paid bills, balanced her husband's checking account and helped him stay current in his bills.  (Tr. 228).  Duncan had a car and drove.  (Id.).  Dr. Pulcher observed that Duncan was moderately depressed, with a

"somewhat blunted affect."  (Id.).  Duncan reported that she recently suffered amnesia, that she was always tired and "could sleep 24 hours a day," had a general loss of interest in things and that if she did not talk Zoloft she would be suicidal.  (Id.).  On a mood scale of 1 to 10, with 10 indicating a very good mood, Duncan rated herself a "3 or 4."  (Id.).  Duncan denied having hallucinations, but then told Dr. Pulcher that she saw dead family members.   (Id.).   Duncan has a significant family history of schizophrenia.  (Id.). Dr. Pulcher diagnosed Duncan with "Major Depressive Disorder, severe, with mood congruent psychotic features" and assigned her a GAF of 45.  (Tr. 229).

Duncan underwent another consultative examination on February 3, 2004.  (Tr. 289-290).  The exam was conducted by Cedric B. Fortune, M.D. (Id.).  Dr. Fortune noted Duncan's history of neck and wrist pain and lifelong depression.  (Tr. 289).  Dr. Fortune conducted a physical examination and diagnosed Duncan with right wrist pain, neck pain, low back pain and a history of asthma and depression, for which Duncan was being treated, and a history of migraine headaches.  (Tr. 290).  Dr. Fortune opined that Duncan could perform reasonable activities including sitting, standing, walking and lifting.  (Id.)

On November 17, 2009, Duncan underwent a disability consultation, this time with Wayne E. Spencer, M.D.  (Tr. 513-524).  Dr. Spencer examined Duncan, and conducted an extensive review of her medical records.  (Tr. 513).  Dr. Spencer noted Duncan's history of fibromyalgia, which Duncan reported as increasing in severity over the years.  As a result of the fibromyalgia, Duncan was uncomfortable walking more than about 30 feet at a time and she could "rarely" climb stairs.  Dr. Spencer also noted

Duncan's history of neck, shoulder and back pain, migraines, and emphysema."  (Tr. 514-515).  As for Duncan's depression, Dr. Spencer stated:

> She states that she has essentially been depressed since childhood.  She describes an abusive household when she was growing up. In about 1980 she overdosed on Percocet and was hospitalized for several days.  She was not placed on any therapy or psychiatric follow-up.  Another overdose was in about 1985 where she was hospitalized at KU Medical Center in the psych unit for about 11 days.  In her 40's she was started on Zoloft by her OB.  Within 1-2 days this significantly improved her symptoms.  She now continues on Zoloft but notes that she tends to feel significantly depressed anytime she misses a dosage.  She feels that she is intolerant of any stresses.  She has a tendency to cry rather frequently.  She does feel that she interacts with others reasonably well and does not describe vegetative symptoms.

(Tr. 514).

Following a physical exam, Dr. Spencer found decreased range of motion in Duncan's right shoulder and some impairment in Duncan's ability to use her biceps and triceps.  (Tr. 517).  Dr. Spencer also found that Duncan did not appear to have severe respiratory insufficiency and "was inclined to think that [Duncan's migraine headaches were] merely tension headaches."  (Id.).  Dr. Spencer concluded that he doubted that Duncan could do hard physical activity, and that most of her impairments were related to low back and hip pain and right shoulder pain.  (Id.).  Dr. Spencer also doubted that Duncan could do prolonged standing or sitting for long periods of time without having to change positions and that she could not manage more than a few stair steps on occasion throughout the day.  (Id.).

Sheila Swearington, Ph.D., conducted a consultative exam on November 4, 2009.  (Tr. 506-509).   Duncan reported to Dr. Swearington that she had been

diagnosed with asthma and emphysema twelve years previously and was diagnosed with fibromyalgia "about six or seven years ago."  (Tr. 507).  Duncan indicated that her depression had been a problem for many years and that if she did not take Zoloft she would kill herself.  (Id.).  Further, "[s]he states that although she has been depressed for many years, she believes her current situation contributes to the severity of it."  (Id.).  Duncan reported that when she was very depressed she saw deceased family members and that she was hospitalized twice—once for depression and a drug overdose and once approximately twenty years ago for a drug overdose.  (Tr. 508).  She stated she received psychological treatment more than 20 years ago at which time she was prescribed Zoloft and the last time she saw a therapist, Dr. Benton, was approximately 10 years ago.  (Id.).

Dr. Swearington found that Duncan's mental status examination was consistent with depressed mood, congruent affect and her diagnostic impression was that Duncan suffered from Major Depressive Disorder, Recurrent, Moderate.  (Tr. 506, 509).

### 2.    Other Medical Records

Duncan was seen at the Truman Medical Centers in Kansas City, Missouri on November 17, 2003.  (Tr. 275-276).  The record of this visit states that Duncan's ex-husband told her that she was a "myriad of nickel and dime problems" and she wanted to find out what was wrong with her.  (Tr. 276).  Duncan complained of headaches, vision problems, neck pain, numbness in her arms, wrist pain that "keeps getting worse," low back pain, joint pain, allergies "to everything," emphysema, asthma, pain in her legs, knee problems, "really bad" memory loss and extreme fatigue.  (Id.).  Duncan reported that these symptoms began in 2001.  (Id.).   The physician attempted to

discuss the role depression might play in Duncan's symptoms, but Duncan "was unwilling to consider this." (Id.)

Dr. Block first saw Duncan as a patient on January 28, 2004. (Tr. 278-280). Duncan reported to Dr. Block that she had joint and muscle aching, which began three years prior. (Tr. 278). Duncan reported extreme fatigue, which began several months before the muscle and joint aching. (Id.). Duncan also reported that "in the last several years" she experienced migraines 2-3 times per week to 2-3 times per day, blurred vision, "God-awful" pain radiating down her left arm with pain so severe that she writhes on the floor. (Id.). Duncan told Dr. Block that she could no longer type. (Id.). Duncan also reported asthma, allergies, tinnitus, pain behind her right ear, warts, lower extremity swelling and depression, for which she was being treated with Zoloft "with marked improvement." (Tr. 279). Dr. Block's physical examination revealed trace pitting edema of Duncan's legs, no noticeable neurologic defects, and an "alert and oriented" mental status. (Id.). The record does not indicate that Dr. Block tested Duncan for fibromyalgia, but his chart notes indicate that he might consider hormone replacement therapy for Duncan's fibromyalgia and chronic fatigue syndrome. (Tr. 280). Dr. Block noted that the diagnosis of Chronic Obstructive Pulmonary Disease or asthma "certainly is valid." (Id.). Dr. Block commented that "at this point in your life you are disabled. It may be with good medical guidance, fortitude, good care and luck you will be able to be functional to again participate in the work force." (Id.).

On April 21, 2004, Dr. Block wrote a summary of Duncan's "most recent office visit".   (Tr. 281-283).[13]   Dr. Block noted that Duncan's "Chronic Fatigue Syndrome/Fibromyalgia" showed no "super improvement" but that "she is feeling a little better.  She is reapplying for disability.  She will show this note to her lawyer." (Tr. 281).  Under "Plan," Dr. Block wrote:  "My door is always open for this young lady.  She can E-mail me, write me, or call me and I'll do whatever I can to help her.  She deserves it." (Id.).

Dr. Block saw Duncan for an office visit on December 30, 2004.  (Tr. 300-302). His notes indicate that when Duncan had been traveling in Florida her headaches had subsided, but returned when she came back to Kansas City.  (Tr. 300).  Duncan was doing "reasonably well" with her asthma.  (Id.).  Dr. Block noted in the category of "disability" "[s]he lost the first round and it is now in legal hands for her fibromyalgia/chronic fatigue syndrome." (Id.).  Dr. Block also suspected that Duncan may be suffering from Lyme disease,[14] but he did not test Duncan for Lyme disease.

Duncan next saw Dr. Block on April 29, 2005, when she "came in feeling lousy with a myriad of medical problems as noted below." (Tr. 303).  Dr. Block's notes indicate that Duncan was continuing to experience migraines and her fibromyalgia/chronic fatigue syndrome was "much worse with all the stressors that are happening." (Id.).  Dr. Block opined that Duncan met the criteria for Chronic Fatigue

---

[13]   It is unclear whether this letter relates to an office visit on April 21, 2004, the office visit on January 28, 2004, or some other office visit.

[14]   Lyme Disease is a bacterial infection spread through the bite of the black-legged tick.  http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0002296/.

Syndrome.  (Id.).  Dr. Block further noted that Duncan was continuing to take Zoloft and that on the day of her visit her affect was within normal limits.  (Tr. 305).

Duncan visited Dr. Block on March 16, 2006 to discuss her fibromyalgia.  (Tr. 525-527).  Dr. Block again opined that Duncan may be suffering from Lyme disease and discussed both conventional (antibiotic) and holistic (silver, herbs) treatments.  (Id.).  A handwritten note in the chart indicated that Duncan "decided to try the silver."  (Id.)

Dr. Block wrote to Duncan's attorney, Sharon Meyers, on July 7, 2006 to report to Meyers on a recent office visit with Duncan.  (Tr. 310).  Dr. Block explained that he first met Duncan in the 1980s at family gatherings and they talked over the years and on the phone, but he did not see her as a patient until January, 2004.  (Tr. 310).  Dr. Block stated that "Grace is now receiving disability determination.  It is important to note that her problems did not suddenly begin the past few years, but have been progressing over at least the last two decades, accelerating rapidly since 2000."  (Id.).

The record contains two statements by Duncan's friend and therapist, Dr. Benton.  (Tr. 277, 529-530).  These statements are not medical records, but appear to have been provided to Duncan to submit to the SSA in connection with her application for DIB and SSI.[15]  Dr. Benton's first letter, dated December 1, 2003, stated that Duncan had been Benton's patient since 1998 and that Dr. Benton believed

> that [Duncan] has multiple physical conditions creating major difficulties for her regarding inability to work and function in even normal everyday activities.  She continues to function to the best of her ability, however, I have lately seen slight depression beginning to effect [sic] her due to her sometimes disabling pain.

---

[15]     Both letters are addressed "To Whom it May Concern."

(Tr. 277).

Dr. Benton's second letter, dated October 15, 2006, was written after ALJ Bock issued his August 25, 2006 decision finding that Duncan was not disabled before August 1, 2003 (Tr. 30) and during the pendency of Duncan's request for review of the ALJ's decision.   (Tr. 18).   In this letter, Dr. Benton admits that she is not qualified to comment on Duncan's physical problems, but goes on to opine that Duncan was "truly fully disabled by the time she left her job as a nanny in the winter of 2001."  (Tr. 529). Dr. Benton noted that she met Duncan in 1988 when Duncan saw her for severe depression after a suicide attempt and hospitalization.  (Id.).   Dr. Benton further stated that following a car accident in 2000, Duncan began to have "spells of confusion, forgetfulness and visual problems" and made another suicide attempt sometime after the winter of 2001[16] (Id.).   Dr. Benton commented that Duncan's "refusal" to see Dr. Benton in her office continued and that while she originally paid Dr. Benton for services, Dr. Benton did not charge Duncan when Duncan visited with Dr. Benton in her home or talked with her on the phone.  (Tr. 530).   Dr. Benton acknowledged that she did not keep written records of her consultations with Duncan. (Id.).

On November 10, 2006 nurse William Thompson III wrote a letter on Duncan's behalf.  (Tr. 325-326).   In addition to being an R.N., Thompson holds a license as a massage therapist, and it was in that capacity that he treated Duncan for back and neck

---

[16]    Dr. Benton's letter is unclear as to the actual date of Duncan's second suicide attempt.  The letter merely states that "in the winter of 2001 [Duncan] moved back to Tonganoxie with her ex-husband, Bob. * * * When I spoke to her a couple of months later, she was still trying to find a doctor that would see her.  The continual rejections from them on top of the physical problems eventually led to another suicide attempt." (Tr. 529).

pain in the summer of 1999.  (Id.).  Thompson and Duncan became personal friends and saw each other regularly.  According to Thompson, Duncan's health issues would have been helped by proper diagnosis and treatment.  (Id.).  Thompson did not give an opinion as to the date of onset of Duncan's disability or her current level of disability, or the source (if other than Duncan) of the information contained in his letter.

In April, 2010, Plaintiff's lawyer Gregory Eufinger located additional medical records from Dr. Phillip Stevens and submitted those records to the SSA.  (Tr. 531-538).  These records are of office visits between 2006 and 2010.  (Id.).  Dr. Steven's chart notes recount Duncan's musculoskeletal pain (Tr. 533),cough (Tr. 534), sore throat and dental problems (Tr. 536), and difficulties with thrush (Tr. 537). These records shed no light on Duncan's disability on date of onset of her disability.

### 3.   Physical and Mental RFC Assessments

Physical and mental RFC assessments were performed in 2003 (Tr. 233-243), and 2004 (Tr. 284-88).  The 2003 RFC physical assessment conducted by J.F. Legler, M.D., concluded that Duncan could occasionally lift 20 pounds, frequently lift 10 pounds, stand and/or sit about 6 hours in an 8-hour workday, and sit about 6 hours in an 8 hour workday.  (Tr. 234).  There is a handwritten note on page six of Dr. Legler's assessment which stated "Insufficient evidence DLI of 12/02."   (Tr. 238).   In an attachment to this assessment, M. Tawadros, M.D., noted: "Title 2 claim had DLI of 12/31/02.  The evidence is insufficient to establish that the claim[ant] would have met or equaled listing or that the claim would have been allowed due to medical vocational issues prior to the DLI.  Recommend that prior RFC be reaffirmed with respect to the DLI." (Tr. 239).  Dr. Tawadros had received Dr. Marilyn Benton's December 1, 2003

letter regarding Duncan, in which Dr. Benton commented that "[Duncan] has multiple physical conditions creating major difficulties for her regarding inability to work and function in even normal everyday activities." (Tr. 277). Dr. Tawadros essentially rejected Dr. Benton's opinion, noting that "the source treats for psychological impairment and the records that accompany the statement offer evidence that the symptoms seem to improve and get worse and improve again." (Tr. 239).

Dr. Carol Adams conducted a Mental RFC on September 15, 2003. (Tr. 240-242). Dr. Adams found that Duncan was "moderately limited" in only two of twenty areas: the ability to carry out detailed instructions; and the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest breaks. (Tr. 240-241). Dr. Adams referenced Dr. Pulcher's comment that Duncan may have been experiencing hallucinations of dead family members, but noted that "despite her depression she demonstrates only mild impairment in her ADL (Activities of Daily Living) and social functioning. * * * Her depression may interfere with her ability to perform job duties consistently. While the claimant's symptoms are severe, they are not expected to prevent her from being gainfully employed." (Tr. 242).

Dr. Adams also completed the Psychiatric Review Technique Form for Duncan's current condition on September 15, 2003. (Tr. 244-256). Dr. Adams concluded that Duncan had a credible Medically Determinable Impairment of depression, for which Duncan was taking medication, but that, while severe, her impairments did not meet or equal a listing. (Tr. 256).

Dr. Adams also completed Psychiatric Review Technique Form for the period "to DLI 12/31/2002" on September 15, 2003. (Tr. 259-272). Dr. Adams indicated that there was insufficient evidence to establish the presence of the "B" and "C" criteria of the listings. Her note at the conclusion of the review stated:

> The Claimant is a 46 year old woman who is making an initial DIB application that is concurrent. This PRTF addresses the period up to the DLI of 12/31/2002. She alleges having numerous physical problems in addition to depression. The only medical evidence we have of the claimant's depression is a note from Dr. Phillip Stevens indicating that the claimant is taking Zoloft with excellent results. This note was dated 10/18/1999 during which time she continued to work. We have no additional evidence regarding the claimant's functioning prior to the DLI. The claim is denied due to insufficient evidence.

(Tr. 271).

Dr. Block completed a "Physical Residual Functional Capacity Questionnaire" on Duncan's behalf on February 8, 2004.[17] (Tr. 284-288). Dr. Block noted his 20-year relationship with Duncan, and then opined that she suffered from carpal tunnel [syndrome], fibromyalgia, and chronic fatigue and that her prognosis was "poor." (Tr. 284). Dr. Block identified depression as affecting Duncan's physical condition and he concluded that Duncan was incapable of even "low stress" jobs. (Tr. 285). Dr. Block believed that Duncan had significant limitations with hand dexterity, fine manipulation with her fingers and reaching overhead. (Tr. 287). According to Dr. Block, the symptoms and limitations he described in his assessment had been present since 2001. (Tr. 288).

---

[17] The ALJ gave little weight to Dr. Block's opinions, including this physical RFC. (Tr. 413, citing Tr. 284-288)

## V.    EFFORTS TO OBTAIN MEDICAL EVIDENCE

Duncan has been represented by counsel throughout these proceedings.   (Tr. 55, 327, 356, 539, 545).   From the first to the most recent hearing, the ALJs and the SSA have commented on the lack of medical evidence to support the disability onset date that Duncan alleged in her application—April 1, 2001.   In connection with ALJ Hoban's decision in 2005, the SSA noted that no medical records had been received from the Johnson County Mental Health Center, the Shawnee Mission Urgent Care, Stephen Gordon, D.O. or from Dr. Stevens.   (Tr. 51).   Further, the SSA stated "[t]he medical evidence shows…that prior to 12/31/02, your date last insured, there is insufficient medical evidence to show an impairment that prevents work." (Tr. 52).

ALJ Bock continued the October 7, 2009 hearing so that Duncan's counsel could update Duncan's medical records.   (Tr. 541).   At the hearing on April 13, 2010, Duncan's counsel told Judge Bock that all of the records available were in the record, and that "that's all there is, there is no more.   Believe me, I wish there was but there isn't."  (Tr. 550).   Further, the Commissioner repeatedly notified Duncan of the need to obtain medical evidence and her right to request a subpoena to obtain documents.  (Tr. 70) (May 12, 2005 Notice of Hearing); (Tr. 92-93) (June 28, 2006 Notice of Hearing); (Tr. 204) (reminder notice from ALJ Hoban stating "Please be advised that you need to obtain and send us all evidence relevant to this claim."); (Tr. 459, 461) (August 28, 2009 Notice of Hearing); (Tr. 469, 471) (March 12, 2010 Notice of Hearing); (Tr. 483, 485) (May 3, 2010 Notice of Hearing).

Duncan was aware of the lack of medical evidence, as evidenced in her appeal of ALJ Bock's first determination to the United Stated District Court in Kansas.  Duncan

argued that the ALJ had failed to properly develop the record—a contention the District

Court rejected.  (Tr. 439-442).  Magistrate Judge Bostwick commented that

> [Duncan] points to no additional information which might
> have been revealed by more questioning and to no
> additional evidence regarding her condition in 2001 and
> 2002 which would have been available had the ALJ sought
> additional evidence from treating or examining physicians.
> In fact, Duncan admits that 'the medical records from that
> period of time are not as extensive or detailed as Duncan
> would like.' (Pl. Br. 9).    The ALJ did not err in his
> development of the record.

(Tr. 442).

## VI.    THE PARTIES' CROSS-MOTIONS FOR SUMMARY JUDGMENT

Duncan moved for summary judgment and sought an order awarding her a

period of disability beginning before her DLI[18], or, in the alternative, an order remanding

the case for further proceedings.  Pl. Mem., p. 2.  As previously noted, Duncan admitted

that there was sufficient evidence to support the ALJ's decision.  Id., p. 15.  Instead,

Duncan focused on the need to remand the matter in light of the additional medical

records her new counsel had obtained.  Id., p. 16 ("All Ms. Duncan seeks in an

opportunity for a disability evaluator within the initial levels, and/or an ALJ, perhaps with

the help of a medical expert, and/or the Appeals Council, to review these additional

records…to determine whether this, combined with all of the other evidence, is enough

to establish an earlier onset date.").  According to Duncan's counsel, the lack of the

records he has now located "seriously inhibited [Duncan's] ability to prove up her claim

as being disabled before the date last insured expired."  Quinn Aff., ¶17.  Duncan

correctly noted that she had previously identified the facilities from which her current

---

[18]    Despite asking this Court for an award of benefits, Duncan did not pursue that argument in her brief.

counsel was able to obtain records (Johnson County Mental Health Center and the Kansas University Medical Center) when she first applied for benefits.  Pl. Mem., p. 17, n.12; (Tr. 147-148).

Notably, Duncan did not argue that the newly discovered medical records supported a finding of disability before August 1, 2003.  Rather, Duncan maintained that the records showed that older records actually existed that would have established that Duncan was "likely" disabled before her DLI.  Quinn Aff., ¶18.  At the same time, Duncan acknowledged that the records attached to the Quinn affidavit "may not be enough" to establish an earlier disability onset date, although she simultaneously argued that the records were sufficient for that purpose.  Pl. Mem., p. 16.

Duncan now seeks a remand so the SSA may review the records and make its own determination.  Duncan asserts that she has not gotten a "fair shake" because the SSA "dropped the ball" in obtaining the older records, "especially after the Federal Court Order."  Id., p. 17; Quinn Aff., ¶18.[19]  Duncan characterized the SSA's efforts to obtain records as "minimal."  Id., p. 6.

In opposition, the Commissioner characterized Duncan's argument for summary judgment on the issue of an earlier onset date as "irrelevant" because Duncan fully acknowledged that there was sufficient evidence in the record to support the ALJ's decision.  Defendant's Memorandum in Support of Motion for Summary Judgment ("Def. Mem."), p. 11 [Docket No. 14].  Further, the Commissioner argued that the newly discovered medical evidence did not support a remand because the evidence did not

---

[19]     Duncan noted that the failure to obtain the records earlier may present a case of legal malpractice, which she acknowledges cannot be pursued through the SSA.  Pl. Mem., p. 17, n. 12.

meet the materiality standard of 42 U.S.C. §405(g) (remand may be had if the additional evidence is material).  Id., p. 12.  According to the Commissioner, the subsequently discovered records are not material and actually support the ALJ's finding that Duncan received only sporadic treatment before August 1, 2003.  Id., p. 13 (citing Tr. 414).

The Commissioner took issue with Duncan's attempt to shift the burden for the failure to obtain the older records on to the SSA.  Def. Mem., pp. 14-18.  The Commissioner reviewed all of the efforts by the SSA to obtain a complete record, its reminders to Duncan to obtain records, and the repeated representations of counsel to the ALJs that the record was complete.  Id., p. 15.  Similarly, the Commissioner rejected Duncan's claim that the Appeals Council erred by not keeping the record open for the submission of additional evidence.  The Commissioner noted that the ALJ directed Duncan to file written exceptions to his decision to the Appeals Council within 30 days of the date of his decision, and she failed to do so.  Id., p. 17.  Instead, the Appeals Council waited four months before issuing its decision, during which time Duncan never filed any written exceptions.  Id.

## VII.   DISCUSSION

Duncan's admission that there is substantial evidence to support the ALJ's decision closes the door to further discussion of that issue.  Further, Duncan's claim that the Appeals Council erred by failing to keep the record open "once they were specifically informed that that more records would be forthcoming," (Pl. Mem., p. 15), does not comport with the record.  Duncan's counsel's letter to the Appeals Council by no means "specifically informed" the Council of the existence of additional records. What counsel did tell the Appeals Council was that he wanted to "gather additional

46

evidence." (Tr. 400). In any event, the record is clear that Duncan did not file exceptions to the ALJ's decision within the 30 days permitted following the ALJ's decision (Tr. 396-399), or ever submit additional medical records to the Appeals Council during the four months before it issued its decision. Under these circumstances, the Count finds no error by the Appeals Council in its handling of Duncan's Request for Review.

The only remaining substantive issues before the Court are whether the ALJ adequately developed the record[20] and whether the matter should be remanded in light of the subsequently discovered medical evidence.

### A.    The ALJ Adequately Developed the Record

Duncan was required to show that her impairments were disabling on or before December 31, 2002. Cox v. Barnhart, 471 F.3d 902, 907 (8th Cir. 2006) (citing Pyland v. Apfel, 149 F.3d 873, 876 (8th Cir. 1998)); Thomas v. Sullivan, 928 F.2d 255, 260 (8th Cir. 1991) (claimant bears the burden of proving disability and is responsible for "presenting the strongest case possible."). On the other hand, the ALJ has a "responsibility to develop the record fairly and fully, independent of the claimant's burden to press his case." Snead v. Barnhart, 360 F.3d 834, 838 (8th Cir. 2004).

The issue of the ALJ's development of the record was presented to Magistrate Judge Bostwick and he concluded that through the date of the ALJ's August 26, 2006 decision, the ALJ had not erred in his development of the record—a conclusion that was

---

[20]    Duncan did not argue that the ALJs' failure to develop the record resulted in reversible error. However, because Duncan raised the issue of the ALJ's role in failing to develop the record, and sought a vacation of the ALJ's decision regarding the onset date of Duncan's disability, the Court has construed the argument as suggesting that the ALJ committed reversible error and briefly addresses the issue.

adopted by the District Court.  (Tr. 419, 439-442).   Duncan has presented this Court

with no facts that would support disturbing this determination[21] and, at any rate, this

Court has independently concluded that the ALJ did not err in his development of the

record.  To the contrary, the record indicates that the SSA and the ALJs went to great

lengths to ensure that the record was complete, including quizzing Duncan's lawyers

repeatedly as to the completeness of the record.  At the June 8, 2005 hearing, this

exchange took place: "ALJ Hoban: So the medical file is at 1F through 20F.  Is that your

understanding of the file?  Atty: Yes sir, Your Honor." (Tr. 330).  At the July 26, 2006

hearing, ALJ Bock asked: "Any additional documentary evidence to offer at this time?"

to which Duncan's attorney responded, "No, Sir." (Tr. 366).  At the April 13, 2010

hearing, these exchanges took place:  "ALJ Bock:  Counsel, I don't see any medical

records of any complaints or treatment for any mental illness before Dr. Polcher [sic]."

Atty: "I don't, I don't believe there is any other than—there's a couple of reports from Dr.

Benton … . ALJ:  I don't have any records, I have to have records." *** Atty:  I wish—I

hope and wish and pray that there were medical records.  The problem is, there

aren't…all of the records that we're aware of are there.  ALJ: Okay.  Atty:  And that's all

---

[21]     The doctrine of issue preclusion applies to prevent the re-litigation of issues that have already been decided if: "(1) the issue sought to be precluded [is] the same as that involved in the prior litigation; (2) that issue must have been actually litigated; (3) the issue must have been determined by a valid and final judgment; and (4) the determination must have been essential to the judgment.  Dodson v. University of Ark. for Med. Scis., 601 F.3d 750, 761 (8th Cir. 2010), cert. denied 131 S.Ct. 902 (2011).  "To determine if an issue was actually litigated and was necessary to the decision in the prior action, the court should examine the record of the earlier proceeding."  Id.  It is evident from Magistrate Judge Bostwick's R & R that this issue was briefed by Duncan and the Commissioner.  (Tr. 439-442).  Therefore, this Court considers the issue of the ALJ's development of the record up to the date of the District Court's order to have been decided and that re-litigation of the issue is barred.

there is, and there is no more.  Believe me, I wish there was but there isn't.* * * We have all the records that I know of. (Tr. 549, 550, 559).

ALJ Bock made more efforts to ensure that the record was complete, including continuing the October 7, 2009 hearing so that the record could be updated, and, at the April 13, 2010 hearing, when he decided that he would have a neurologist review Duncan's records from 2001 and later to see if an onset date earlier than August, 2003 could be established.  (Tr. 555) ("ALJ:  [A]ll right, I don't want to do this, but I'm going to. I'm going to get another, I'm going to get a neurologist to look at these records back in 2001 and going forward on the cervical spine.  That's your only hope.").

As Magistrate Judge Bostwick noted, "where Duncan is represented by counsel at the ALJ hearing, the ALJ 'should ordinarily be entitled to rely on the claimant's counsel to structure and present claimant's case in a way that the claimant's claims are adequately explored.'"  (Tr. 441) (citing and quoting <u>Hawkins v. Chater</u>, 113 F.3d 1162, 1168 (10th Cir. 1997)).  Further, Duncan's suggestion that the SSA "dropped the ball" in obtaining the older records, "especially after the Federal Court Order," (Pl. Mem., p. 17), is meritless.  There is no reference in Magistrate Judge Bostwick's R & R or in the District Court's Order to the need to obtain additional records.

Given the extraordinary number of opportunities Duncan has been given to develop the record regarding the onset date of her disability, and her counsels' <u>repeated and firm</u> assurances to the ALJs that the record was complete, this Court does not lay fault on the Commissioner for the failure to secure the records that Duncan's current counsel has now located.  The ALJ committed no error in his development of the record.

**B.      Remand in Light of Subsequently Discovered Medical Records**

A court may remand a social security claim for consideration of subsequently located evidence "only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." Hepp v. Astrue, 511 F.3d 798, 808 (8th Cir. 2008) (quoting 42 U.S.C. § 405(g)).  Evidence is "new" only if it was "not in existence or available to the claimant at the time of the administrative proceeding." Ferguson v. Commissioner of Social Sec., 628 F.3d 269, 276 (6th Cir. 2010) (internal citation and quotation omitted).  "Material" evidence is evidence which is "non-cumulative, relevant, and probative of the claimant's condition for the time period for which benefits were denied, and there must be a reasonable likelihood that it would have changed the Secretary's determination." Woolf v. Shalala, 3 F.3d 1210, 1215 (8th Cir.1993).  "Good cause does not exist when the claimant had the opportunity to obtain the new evidence before the administrative record closed but failed to do so without providing a sufficient explanation." Hepp, 511 F.3d at 808 (citing Hinchey v. Shalala, 29 F.3d 428, 433 (8th Cir.1994)); see also Ferguson, 628 F.3d at 276 ("A claimant shows 'good cause' by demonstrating a reasonable justification for the failure to acquire and present the evidence for inclusion in the hearing before the ALJ… .") (internal citation and quotation omitted); Lisa v. Secretary of Health and Hum. Servs., 940 F.2d 40, 45 (2nd Cir. 1991) (to show "good cause" requires that the plaintiff "go beyond showing that the proffered evidence did not exist during the pendency of the administrative proceeding [,and must also] establish good cause for failing to produce and present the evidence at that time.").

Duncan's current counsel obtained records from the Johnson County Mental Health Center, dated March 8, 2000 to March 22, 2001 and from the Kansas University Medical Center for treatments in January, 1989.  Quinn Aff., Exs. 1, 2.  The evidence is not "new" in that it existed at the time of all hearings.  Indeed, Duncan identified both facilities as providers from which records should be obtained when she first applied for benefits.  (Tr. 147-148).  Further, Duncan provided no explanation (much less good cause) as to why her previous attorneys could not have obtained the records obtained by her current counsel (except possibly malpractice).  These findings alone supports a decision that remand is not appropriate.  However, even assuming good cause for failing to obtain the records earlier in this long process, the Court concludes that the ALJ's decision would not have changed because the records are not material.

The records from Kansas University include a record of Duncan's hospital admission for depression and suicidal ideation in January, 1989.  Quinn Aff, Ex. 2, pp. 3-4.  The record indicated that when Duncan was discharged after an eight-day stay she "exhibited progressively brightened affect and denied depression or suicidal ideality by day 2 or 3 of hospitalization, and had plans for resolving her problems as an out-patient, and had good future plans."  Id., p. 4.  Duncan was diagnosed with "adjustment disorder with depression."  Id.  The balance of the Kansas University Medical Center records, dating from 1984-1988, relate to Duncan's treatment for obstetric and gynecological problems and her wrist injury in 1989.  Id., pp. 6-46.

Duncan began seeing Charles A. Krall, Ph.D., at the Johnson County Mental Health Center on March 8, 2000 for depression.  Quinn Aff., Ex. 1, pp. 1-4.  Dr. Krall's

Intake Assessment Form indicated that Duncan had a GAF of 52.[22]  Id., p. 3.  Duncan was having marital difficulties and Dr. Krall indicated his goals with Duncan were to "increase non-depressed functioning" and "clarify relationship issues and needs."  Id., p.6.  Dr. Krall's notes indicate that the sessions were focused on Duncan's marital and relationship issues.  Id., pp. 11-22.

On April 3, 2000, Dr. Krall recorded that Duncan had almost called him at night because of suicidal feelings, but also described herself as "too chicken" to harm herself. Id., p. 18.  On April 17, 2000, Dr. Krall noted that Duncan was having difficulty working as a medical transcriptionist because of her internet connection.  Id., p. 16.  On May 30, 2000 Duncan "report[ed] much back pain."  Id., p. 13.  On June 14, 2000, Duncan questioned whether she needed psychotherapy.  Id., p. 12.

Dr. Krall's discharge summary, written March 22, 2001, noted that Duncan was "less depressed than at intake and somewhat more clear regarding relationship issues." Id., p. 7.  Her discharge GAF was 62.[23]  Id., p. 7.  Dr. Krall noted "dropped out" as the reason for discharge and that his last contact with Duncan was July 5, 2000.  Id.  Dr. Krall's primary diagnosis at discharge was Dysthymic Disorder with a secondary diagnosis of "Major Depressive Disorder Recurrent Moderate."  There are no references

---

[22]    A GAF score between 51 and 60 constitutes "moderate symptoms…or moderate difficulty in social, occupational, or school functioning (eg. few friends, conflicts with peers and co-workers).   American Psychiatric Association, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, at 34 (4th ed. Text Revision 2000).

[23]    A GAF score between 61 and 70 constitutes "some mild symptoms (eg. depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning…but generally functioning pretty well, has some meaningful interpersonal relationships."   American Psychiatric Association, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, at 34 (4th ed. Text Revision 2000).

in these records to Duncan's inability to work, her level of disability or to any non-psychiatric medical evidence concerning Duncan's physical condition.

As a preliminary matter, the Court notes that none of these records are probative of Duncan's condition during the time period for which benefits were denied—April 1, 2001 to July 31, 2002–as none of the records cover that time period.

However, even had these records been made available to during any of the hearings before ALJ Bock, the Court concludes that they are not material because they would not have changed his determination regarding Duncan's onset date of disability.

It has never been disputed that Duncan has a long-standing history of depression, or that she has been treated for that depression with antidepressant medication for many years. The records before the ALJ Bock showed that in October 1999, Dr. Stevens reported that as early as 1997, Duncan had been taking Zoloft with "excellent results," (Tr. 212); in April 2000, Dr. Stevens reported that "Zoloft seems to counteract any serious depression; in May 2000, he indicated that Duncan was "not mentally depressed;" and in July 2000, Dr. Stevens noted there no signs of depression. (Id.) Further, ALJ Bock was aware that during consultative examinations in August of 2003, Duncan reported that she was depressed, took Zoloft and had not seen a psychiatrist for two years or been in mental health counseling recently. (Tr. 223, 227). Similarly, ALJ Bock had been apprised that during two consultative examinations in November 2009, Duncan reported she had been depressed since childhood (Tr. 514); in 1980 had overdosed on Percocet and was hospitalized for several days and had no therapy or psychiatric follow-up (id.); had another overdose in about 1985 where she was hospitalized at KU Medical Center in the psych unit for about 11 days (id.); started

on Zoloft which significantly improved her symptoms; she had no therapy since approximately 1999, (Tr. 508); and that she tends to feel significantly depressed anytime she misses a dosage.  (Tr. 514).

While the records from Johnson County Medical Health Center and Kansas University Medical Center provide additional evidence of those facts, they do not change any of the information that ALJ had before him.  Indeed, in the record closest in time to Duncan's alleged onset date, the discharge summary from Dr. Krall at the Johnson County Medical Health Center, Dr. Krall assigned Duncan a GAF of 62.  Quinn Aff., Ex. 1, p. 7.

Section 405(g) was explicitly intended to reduce the number of remands in Social Security cases.   The Supreme Court explained the legislative history of the remand provision as follows:

> In amending the sixth sentence of § 405(g) in 1980, Congress made it unmistakably clear that it intended to limit the power of district courts to order remands for "new evidence" in Social Security cases.  Pub.L. 96-265, § 307, 94 Stat. 458.  The Senate Report accompanying the amendments explained:
>
>> [U]nder existing law the court itself, on its own motion or on motion of the claimant, has discretionary authority 'for good cause' to remand the case back to the ALJ. It would appear that, although many of these court remands are justified, some remands are undertaken because the judge disagrees with the outcome of the case even though he would have to sustain it under the 'substantial evidence rule.' Moreover, the number of these court remands seems to be increasing.... The bill would continue the provision of present law which gives the court discretionary authority to remand cases to the Secretary, but adds the requirement that remand for the purpose of

> taking new evidence be limited to cases in which there is a showing that there is new evidence which is material and that there was good cause for failure to incorporate it into the record in a prior proceeding.
>
> ***
>
> Congressman Pickle, one of the floor managers of the bill, echoed this explanation when he noted in a floor statement that with the amendment "we have tried to speed up the judicial process so that these cases would not just go on and on and on. The court could remand [them] back down to the ALJ without cause or other reason which was weakening the appeal process at that level." 125 Cong.Rec. 23383 (1979).

> It is evident from these passages that Congress believed courts were often remanding Social Security cases without good reason.

Melkonyan v. Sullivan, 501 U.S. 89, 100 (1991) (internal citations omitted).

This Court is certainly sympathetic to Duncan's desire to present the additional medical records to the ALJ.  But the fact of the matter is that the evidence is not material and has no likelihood of affecting the decision that she was not disabled before August 1, 2003.

For all of these reasons, the Court finds there is substantial evidence in the record to support the decision of the ALJ that Duncan was not disabled before August 1, 2003, and the additional medical records provided by Duncan to support her motion for summary judgment does not change this conclusion.

## VIII.   RECOMMENDATION

For the reasons set forth above,

IT IS RECOMMENDED THAT:

1.      Plaintiff's Motion for Summary Judgment or, in the Alternative for Remand

[Docket No. 6] be **DENIED**; and

2.      Defendant's Motion for Summary Judgment [Docket No. 13] be

**GRANTED**.

Dated: February 13, 2012                    *Janie S. Mayeron*
                                            JANIE S. MAYERON
                                            United State Magistrate Judge

## NOTICE

Under D. Minn. LR 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **February 27, 2012**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections.  Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.  A party may respond to the objecting party's brief within fourteen days after service thereof.  A judge shall make a de novo determination of those portions to which objection is made.